UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

TIMOTHY MERRICK, D.C. d/b/a ALIVE &
WELL CHIROPRACTIC, JOSHUA I.
KANTOR, D.C., JASON PIKEN, D.C. d/b/a
INNATE CHIROPRACTIC OF
MANHATTAN, and CRAIG FISHEL, D.C.,
on behalf of themselves and all others similarly
situated,

      Plaintiffs,

    - against -

UNITEDHEALTH GROUP INCORPORATED,
UNITEDHEALTHCARE, INC.,
UNITEDHEALTHCARE SERVICES, INC.,
OPTUM INC., and OPTUMHEALTH, INC.,

      Defendants.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED:  8/31/2015

**ORDER**

14 Civ. 8071 (ER)

Ramos, D.J.:

   Four Chiropractors, Timothy Merrick, D.C., doing business as Alive & Well

Chiropractic, Joshua Kantor D.C., Jason Piken, D.C., doing business as Innate Chiropractic of

Manhattan, and Craig Fishel D.C. (collectively "Plaintiffs"), assert a class action on behalf of

themselves and others similarly situated, against UnitedHealth Group Incorporated,

UnitedHealthcare, Inc., UnitedHealthcare Services, Inc., Optum, Inc., and OptumHealth, Inc.

(collectively "Defendants" or "United"), asserting violations of the Employee Retirement

Income Security Act of 1974 ("ERISA").  In the instant motion, United moves to compel

arbitration only of Merrick's claims, and to dismiss Merrick's claims.  For the reasons set forth

below, United's motion to compel arbitration of Merrick's claims is GRANTED, and United's

motion to dismiss Merrick's claims is DENIED.  Merrick's claims are instead STAYED.

## I.  Factual Background

### a.  The Allegations

Plaintiffs are healthcare providers licensed to provide chiropractic services in New York. Am. Compl. ¶¶ 1, 3-6.  Plaintiffs provide healthcare services to patients covered under United healthcare plans governed by ERISA ("Covered Patients").  *Id.* ¶¶ 1, 14, 19, 53.  According to Plaintiffs, patients routinely authorize them, as providers, to receive payments from United.  *Id.* ¶ 65, 66, 97, 98, 121-124, 142-144.   As a result, Plaintiffs bill directly to and receive payments directly from United for services provided to Covered Patients.  *Id.* ¶¶ 19, 67, 99, 126, 146.

UnitedHealth Group Incorporated is a health company incorporated in Delaware.  *Id.* ¶ 7. UnitedHealthcare, Inc., UnitedHealthcare Services, Inc., Optum, Inc., and OptumHealth, Inc., doing business as OptumHealth Care Solutions Inc., are wholly owned subsidiaries of UnitedHealth Group Incorporated.  *Id.* ¶¶ 8-11.  Plaintiffs allege that United is a Plan and/or Claims Administrator as defined by ERISA, and is therefore, responsible for determining whether a given claim is covered under the healthcare plans and effectuating payment for any covered services.  *Id.* ¶¶ 7, 17.

Plaintiffs assert putative class action claims against United for United's purported violation of ERISA claims regulation, 29 C.F.R. §2560.503-1 ("Claims Regulation").  *Id.* ¶ 46. According to Plaintiffs, when a Plan or Claim Administrator renders an initial decision on claims, "meaning the decision rendered before any appeal of a claim determination," the Claims Regulation requires claimant, in this case Plaintiffs, to be notified of an "adverse benefit determination"[1] made by the Plan "no[] later than 30 days after receipt of the claim."  *Id.* ¶ 25.

---

[1] The Claims Regulation defines "Adverse Benefit Determination" as:

This time period "may be extended one time by the plan for up to 15 days, provided the plan administrator determines such an extension is necessary . . . and notifies the claimant, prior to the expiration of the initial 30-day period[.]" *Id.* ¶ 25.  Plaintiffs claim that United originally "voluntarily paid . . . benefits within the required time limits set out in the Claims Regulation" but then reversed its initial benefit determination on numerous occasions after the thirty-day time period passed, and, without requesting an extension, requested that Plaintiffs refund the amount allegedly overpaid by United for these benefits.  *Id.* ¶¶ 1, 60-62, 187.  Specifically, United allegedly sent letters to Plaintiffs requesting patient's clinical records after the thirty-day period had passed, and then recouped the allegedly overpaid amounts when Plaintiffs declined to provide clinical records on the basis that United could no longer question the claim.  *Id.* ¶¶ 60, 62.  United allegedly recouped the overpaid amounts by offsetting these amounts from approved claim payments owed to the same providers for services provided to different patients under different healthcare plans.  *Id.* ¶¶ 62, 187.  Plaintiffs assert that United's recoupment of previously paid claims amount to an "Adverse Benefit Determination" as defined in the Claims Regulation.  *Id.* ¶¶ 26, 169, 173.

---

> [A] denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, or termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item of service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

*Id.* ¶ 26.

United specifically requested patient records from Merrick starting at an unidentified

point prior to May 17, 2013 through May 27, 2014:

- On May 17, 2013, United sent a letter to Merrick allegedly reiterating its previous request for documents and specifically requesting the patient records for patients numbered 201, 205, 206, 209, 210, and 213 through 217 for services provided by Merrick in 2012. *Id.* ¶ 127.[2] Merrick "did not forward the requested information and did not otherwise reply to the May 17, 2013 letter" because more than thirty days had passed since United received the claim and United did not request a fifteen day extension, therefore, Merrick alleges he was not required to comply with United's request. *Id.* ¶ 128.

- On September 5, 2013, United allegedly requested Merrick refund the alleged overpayments, listed in a spreadsheet titled "Refund Request Claim Detail," for services provided by Merrick to patients numbered 201, 205, 206, 209, 210, 214 and 218. *Id.* ¶ 129.

- On September 20, 2013, United allegedly sent another letter to Merrick requesting Merrick provide records for patients numbered 201 through 210 for services provided by him in 2013. *Id.* ¶ 130. Merrick "again did not forward the requested information and did not otherwise reply to the September 20, 2013 letter" for the same reasons Merrick did not respond to United's May 17, 2013 letter. *Id.* ¶ 131.

- On October 28, 2013, by letter titled "FOLLOW UP REQUEST – Overpayment Notification," United requested Merrick refund the alleged overpayments for services provided by him to patient number 211. *Id.* ¶ 132.

- On March 27, 2014, United allegedly sent Merrick another letter titled "Outstanding Overpayments" and again requested Merrick refund the alleged overpayments for services provided to patients numbered 201, 205, 206, 209, 210, 214, and 218. *Id.* ¶ 133.

According to Merrick, "United did not offer, in good faith, any informal dispute

resolution procedures regarding the dispute related to its request for medical records" and did not

"invoke the arbitration clauses in the Provider Agreements regarding these disputes." *Id.* ¶¶ 135,

136. After Merrick did not respond to any of United's requests for documentation and

recoupment of the alleged overpayments, United purportedly offset the overpayments by

---

[2] Plaintiffs state that in United's May 17, 2013 letter, United claimed to have previously sent a letter to Merrick requesting patient records. *Id.*

4

reducing the amount United paid Merrick for services performed for other patients covered by other healthcare plans.  *Id.* ¶ 137.

Plaintiffs, including Merrick, allege that they are ERISA beneficiaries asserting ERISA claims on behalf of their patients.  *See id.* ¶¶ 54-58.  Pursuant to ERISA Section 502(a)(1)(B), Plaintiffs request declaratory relief that (a) Defendants have no legal authority, after the time set forth in the Claims Regulation, to reverse benefit determinations it previously made, (b) "cannot recoup monies that have been previously paid[,]" and (c) future payments owed by United for covered services "shall not be reduced—or offset—by any amounts" past the time period allotted in the Claims Regulation.  *Id.* ¶¶ 192-194.  Plaintiffs also request monetary judgment and reimbursement under Section 502(a)(1)(B), for "all amounts . . . taken from Plaintiffs . . . *via* offsetting."  *Id.* ¶ 195.  Pursuant to Section 502(a)(3), Plaintiffs request injunctive relief enjoining United from reversing previously made benefit determinations and offsetting amounts previously paid in violation of the Claims Regulation or, alternatively, requiring United to comply with the Claims Regulation.  *Id.* ¶¶ 197-200.

### b.  The Provider Agreements

Merrick is an "in-network" healthcare provider that routinely treats patients covered under United healthcare plans through his business, Alive & Well Chiropractic.  Am. Compl. ¶¶ 3, 19.  "An 'in-network' provider is a provider who has entered into a contractual agreement with United—*separate and apart from the United Administered Plans*—under which the provider has agreed to accept reduced benefits under the Plans for providing healthcare services to Covered Persons ('Provider Agreements')." [3]  *Id.* ¶ 18 (emphasis original).  Merrick executed two

---

[3] The three other Plaintiffs are not included in this motion because they do not have Provider Agreements with United and thus are "out-of-network" providers.  *See id.* ¶ 19.

Provider Agreements, one with United's New York Non-HMO/non-IPA network (ACN Group, Inc.) (the "Non-HMO Provider Agreement" or "Ex. 1") and the other with United's New York HMO/IPA network (ACN Group IPA of New York, Inc.) (the "HMO Provider Agreement" or "Ex. 2"), in 2011.  *See* Defs.' Mem. at 2; Decl. of Steven Vynorius ("Vynorius Decl.") Exs. 1, 2.[4]  These Provider Agreements specify how Merrick is to submit, bill, process, and be paid for his services.  Vynorius Decl. Ex. 1 §§ 3.3, 4, Ex. 2 §§ 3.4, 6.  Additional rights and obligations of the parties to the Provider Agreements are specified in Operations Manuals, incorporated into the Provider Agreements.  *Id.* Ex. 1 § 4.3 ("A claim will be considered properly completed if Provider complies with the billing procedures set forth in this Agreement, the Plan Summary, the Operations Manual, or other applicable documents"); Ex. 2 § 6.1 (same); *see also* Ex. 3, Ex. 4.

According to United, Merrick was obligated under the Provider Agreements, and documents incorporated therein, to retain and submit substantiating documents upon request for services provided to Covered Patients.  Defs.' R. Mem. at 1; *see also* Vynorius Decl. Ex. 1 §§ 4.3, 7; Ex. 2 §§ 6.1, 6.3, 11; Ex. 3 at 18, 27; Ex. 4 at 17, 26.[5]  If a provider does not provide the

---

[4] "IPA" stands for "independent practice association."  "HMO" stands for "health maintenance organization."  ACN Group, Inc. subsequently changed its name to OptumHealth Care Solutions, Inc.  Vynorius Decl. ¶ 3.

[5] The HMO Provider Agreement states that "Provider shall maintain and provide IPA, ACN, MCO [managed care organization], and [state and federal agencies] . . . with all records relating to services provided to each Member by Provider[,]" "IPA or any authorized agency or organization may request medical records, x-rays or other documents [and] Provider shall provide copies of these records[,]" and "Provider shall provide access to IPA and MCOs, at reasonable times upon demand by IPA and MCOs, to inspect [documents] . . . relating to Provider's performance of this Agreement, including, without limitation, access to Member's medical records and financial records pertaining to the cost of operations and income received for Physical Health Services provided to Members."  Vynorius Decl. Ex. 2 §§ 11.1, 11.2, 11.4.

The Non-HMO Provider Agreement states "Any such records ['medical records, documents, evidences of coverage and other relevant information in Provider's possession upon which ACN relied to reach a decision concerning a Member complaint or grievance'] shall be maintained . . . and shall be readily available to ACN and Plan at all reasonable times[,]" "If requested by ACN, Provider shall provide copies of such records[,]" and "It is Provider's responsibility to provide ACN with requested information and records or copies of records to allow ACN to release

requested documents, United contends that it has the right under the Provider Agreements to recover payments for services rendered.  *See id.* Ex. 3 at 27; Ex. 4 at 26.[6]  Merrick concedes that he did not provide the requested documents to United.  *See* Am. Compl. ¶¶ 128, 131.

United also contends that Merrick is prohibited from billing his patients for payments denied by United because of Merrick's failure to comply with the Provider Agreements' administrative requirements, including Merrick's obligation to provide records to United.  *See* Vynorius Decl. Ex. 1 § 4.2; Ex. 2 § 6.3; Ex. 3 at 17, 19; Ex. 4 at 16, 18.  Conversely, Merrick argues that in accordance with the terms of the written assignments executed by his patients, the patients were and are financially liable for the services provided by him.  Am. Compl. ¶ 137. Merrick further asserts that any purported bar in the Provider Agreements pertaining to patients' responsibility for the services at issue is inapplicable because "United determined that these services were not covered by the health Plans at issue" as shown by United's recoupment and offsetting of payments regarding these services.  *Id.*

In addition to establishing the rights and obligations of Merrick and United, the Provider Agreements also contain arbitration provisions for "any dispute arising out of or relating to" the Provider Agreement or "any disputes about [the parties'] business relationship."  *See* Vynorius Decl. Exs. 1, 2.  The HMO Provider Agreement specifically states:

---

such information or records to Plans as necessary for the administration of the Benefit Contract or compliance with any state or federal laws applicable to the Plans."  *Id.* Ex. 1 § 7.2.

[6] The Operations Manual, incorporated into the Provider Agreements, *see* Vynorius Decl. Ex. 1 § 4.3; Ex. 2 § 6.1, explicitly states "[i]f Optum . . . or other authorized organization requests medical records, x-rays, or other documents, the provider must comply with this request as soon as possible, but not later than 14 days from the request. . . . Optum Audit and Recovery Unit may request medical records for the purpose of verifying paid services. It is the responsibility of the participating providers to comply with this request and submit request records within the time specified in the request.  ***Failure to comply with these requests may result in action to recover payments for services rendered for those cases during the period for which the records are requested***."  *Id.* Ex. 3 at 27 (emphasis added); Ex. 4 at 26 (same).

> In the event of any dispute arising out of or relating to this Agreement, Provider and IPA shall first attempt in good faith to resolve the dispute mutually between themselves. Provider may submit any dispute to IPA for resolution in writing.  IPA may submit any dispute to Provider by contacting Provider in writing. If Provider and IPA are unable to resolve a dispute by mutual agreement, the matters in controversy may be submitted, upon the motion of either party, to arbitration under the Commercial Rules of the American Arbitration Association (AAA). . . .

*Id.* Ex. 2 § 23.  The Non-HMO Provider Agreement similarly provides that:

> ACN and Provider will work together in good faith to resolve any disputes about their business relationship. If the parties are unable to resolve the dispute within 30 days following the date one party sent written notice of the dispute to the other party, and if ACN or Provider wishes to pursue the dispute, it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association. . . .

*Id.* Ex. 1 § 8.

## II.    Procedural Background

On October 7, 2014, Plaintiffs filed their Complaint against United.  Doc. 2.   At a conference held before this Court on January 22, 2015, United was granted leave to file motions to compel arbitration of Plaintiff Merrick's claims and to dismiss the claims of the other three Plaintiffs.  On February 27, 2015, United filed the two motions.  Docs. 41, 43.  On April 29, 2015, Plaintiffs filed an Amended Complaint and their Opposition to United's Motion to Compel Arbitration of Plaintiff Merrick's claims.  Docs. 52, 53.   On June 1, 2015, United filed its reply in support of its Motion to Compel Arbitration.  Doc. 54.  At a conference held before this Court on June 24, 2015, Merrick and United elected to stand on their papers regarding the Motion to Compel Arbitration notwithstanding the Amended Complaint.[7]

---

[7] United was granted leave to file a Motion to Dismiss the Amended Complaint.  By Order dated July 27, 2015, United's Motion to Dismiss the original Complaint was terminated.  Doc. 65.

### III.   Legal Standard

Section 4 of the Federal Arbitration Act (the "FAA" or the "Act") requires courts to compel

arbitration in accordance with the terms of an arbitration agreement, upon the motion of either

party to the agreement, provided that there is no issue regarding its creation.  *AT & T Mobility*

*LLC v. Concepcion*, 131 S.Ct. 1740, 1748 (2011) (citing 9 U.S.C. § 4).  In the absence of clear

and unmistakable evidence to the contrary, courts assume they, not arbitrators, were intended to

decide "certain gateway matters, such as whether the parties have a valid arbitration agreement at

all or whether a concededly binding arbitration clause applies to a certain type of controversy."

*Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003); *Howsam v. Dean Witter Reynolds,*

*Inc.,* 537 U.S. 79, 83-84 (2002); *see also Wachovia Bank, Nat. Ass'n v. VCG Special*

*Opportunities Master Fund, Ltd.,* 661 F.3d 164, 171 (2d Cir. 2011) ("In the absence of an

agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of

whether or not a dispute is arbitrable is one for the court.").  The FAA "leaves no place for the

exercise of discretion by a district court, but instead mandates that district courts *shall* direct the

parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."

*Atlantica Holdings, Inc. v. BTA Bank JSC,* No. 13 Civ. 5790 (JMF), 2015 WL 144165, at *6

(S.D.N.Y. Jan. 12, 2015) (internal quotation marks and citation omitted) (emphasis added).

"To determine whether to compel arbitration, the Court must weigh three primary

considerations: (1) whether the parties agreed to arbitrate; (2) whether the plaintiff's claims fall

within the scope of that agreement; and (3) if federal statutory claims are at issue, whether

Congress intended those claims to be non-arbitrable."  *Murphy v. Can. Imperial Bank of*

*Commerce*, 709 F. Supp. 2d 242, 245-46 (S.D.N.Y. 2010); *see also Application of Whitehaven*

*S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342 (S.D.N.Y. 2014) (*appeal filed* Oct. 4, 2014)

9

(citing *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)).  "[W]here the District Court is required to determine arbitrability, we have noted, the summary judgment standard is appropriate."  *Wachovia Bank, Nat'l Ass'n*, 661 F.3d at 172.  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 91 (2000) (citations omitted).  The resisting party shoulders the burden of proving its defense, whether it argues that arbitration is improper because "the arbitration agreement is invalid under a defense to contract formation," or asserts that "the arbitration contract does not encompass the claims at issue."  *Kulig v. Midland Funding, LLC,* No. 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N .Y. Nov. 13, 2013).

Moreover, "federal policy strongly favors arbitration as an alternative dispute resolution process," thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," and "[f]ederal policy requires [courts] to construe arbitration clauses as broadly as possible."  *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal citations and quotations omitted); *see also, e.g.*, *Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 351 (E.D.N.Y. 2013) ("In keeping with this policy, the Court resolves doubts in favor of arbitration and enforces privately-negotiated arbitration agreements in accordance with their terms.").  "[U]nless it may be said with positive assurance" that the arbitration clause does not cover the disputed issue, the court must compel arbitration.  *Collins & Aikman Prods.*, 58 F.3d at 19 (quoting *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London),* 923 F.2d 245, 250 (2d Cir. 1991)).

Despite the federal policy favoring arbitration, courts only apply the "presumption of arbitrability" if an "*enforceable* arbitration agreement is ambiguous about whether it covers the dispute at hand."  *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 301 (2010)

10

(emphasis added); *see also Allstate Ins. Co. v. Mun,* 751 F.3d 94, 97 (2d Cir. 2014).  "[D]oubts

concerning the scope of an arbitration clause should be resolved in favor of arbitration,"

however, this "presumption does not apply to disputes concerning whether an agreement to

arbitrate has been made."  *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 764 F.3d

210, 215 (2d Cir. 2014) (quoting *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC,* 645

F.3d 522, 526 (2d Cir. 2011)).  "It is the court's duty to interpret and construe an arbitration

provision, but only where a contract is 'validly formed' and 'legally enforceable.'"  *Kulig,* 2013

WL 6017444, at *2 (citing *Granite Rock Co.,* 561 U.S. at 300).

## IV.   Discussion

### a.   Motion to Compel Arbitration

In the instant action, there is no dispute about whether the Provider Agreements and the

arbitration provisions contained therein are valid.  The dispute arises with regards to (1) whether

Merrick's claims, brought allegedly on behalf of his patients, arise under the Provider

Agreements as opposed to the healthcare plan, and (2) if the claims arise under the Provider

Agreements, whether these claims fall within the scope of the Provider Agreements' arbitration

provisions.

The instant action does not implicate the issue of whether United's actions violate the

Claims Regulation.  The question of United's compliance with the Claims Regulation may be

decided, if this Court finds Merrick's claims are subject to the Provider Agreements' arbitration

provisions, by the arbitrator.  *See Bird v. Shearson Lehman/Am. Exp., Inc.*, 926 F.2d 116, 122 (2d

Cir. 1991) ("hold[ing] that statutory claims arising under ERISA may be the subject of

compulsory arbitration" because "Congress did not intend to preclude a waiver of a judicial

forum for statutory ERISA claim."); *Murphy*, 709 F. Supp. 2d at 247 ("The Second Circuit has

11

held that Congress has not evinced an intention to preclude a waiver of judicial remedies for ERISA claims.").

### i. Categorization of Merrick's Claims

Merrick relies on a common distinction in the case law regarding ERISA preemption— the "right to payment" versus the "amount of payment"— to argue that the Amended Complaint asserts claims that arise under and are governed by the healthcare plans and ERISA, not the Provider Agreements, and, therefore, are not subject to the Provider Agreements' arbitration provisions.  Essentially, Merrick contends that ERISA preempts the Provider Agreements.  *See* Pl.'s Opp'n Mem. at 15 n.6.  Conversely, United argues that the "right to payment"/"amount of payment" distinction is irrelevant to the instant action because United's recoupment of its previous payments to Merrick are the "direct consequence of his own failure to comply with his contractual obligations" to provide documentation upon request and thus do not implicate ERISA.  *See* Defs.' R. Mem. at 1.  In the alternative, United argues that even under the "right to payment"/"amount of payment" distinction, Merrick's claims involve the "amount of payment" properly due to him according to the Provider Agreements.  *See id.* at 4.  While the "right to payment"/"amount of payment" distinction is utilized primarily in determining jurisdiction based on ERISA preemption, it is informative in deciding whether Merrick's claims arise under the healthcare plan or the Provider Agreements.

In *Montefiore Medical Center v. Teamsters Local 272*, 642 F.3d 321, 325 (2d Cir. 2011), the Second Circuit explained that "claims that implicate coverage and benefits established by the terms of the ERISA benefit plan" and can be "brought pursuant to § 502(a)(1)(B)" are "right to payment" claims, while "claims regarding the computation of contract payments or the correct execution of such payments" and "are typically construed as independent contractual obligations

between the provider and . . . the benefit plan" are "amount of payment" claims.  *Id.* at 331.  The *Montefiore* court found that the plaintiffs' claims for reimbursement were claims for the "right to payment" because they "implicate coverage determinations under the relevant terms of the Plan, including denials of reimbursement because [:] pre-certification is required, . . . the services were not covered under the plan, or . . . the member is not eligible."  *Id.*  The court did not consider the claims to be "amount of payment" claims because the plaintiffs did not allege "underpayment or untimely payment, where the basic right to payment has already been established and the remaining dispute only involves obligations derived from a source other than the Plan."  *Id.*; *Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of New York, Inc.*, 64 F. Supp. 3d 459, 461, 462 (E.D.N.Y. 2014) (finding "[t]his case does not involve merely the *amount* of payment because the complaint and the Plan documents reveal that any shortfall in benefits is due to a dispute over the medical necessity of [Covered Patient's] treatment, which could only be resolved by interpreting the Plan [and that] . . . . plaintiff has identified no independent legal obligation implicated by United's withholding of payments to plaintiff, which is essential to amount-of-payment claims");[8] *see also Pascack Val. Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 402 (3d Cir. 2004) (finding "the resolution of this lawsuit requires interpretation of the [Provider] Agreement, not the Plan" despite the fact that "[t]he Hospital's claims . . . are derived from an ERISA plan, and exist 'only because' of that plan" because "[c]overage and eligibility . . . are not in dispute.").

---

[8] Merrick points out that in *Plastic Surgery Group*, United argued that the plaintiffs' state law claim alleging that United breached its contract by recouping alleged overpayments from services provided to other patients was a "right to payment" claim preempted by ERISA.  Pl.'s Opp'n Mem. at 14-15.  As explained *infra* at Section IV.b, United's position in the instant action is not contrary to its position in *Plastic Surgery Group*.  *Plastic Surgery Group* involved a coverage determination under ERISA, namely, a dispute regarding whether the services provided to the covered patients were medically necessary as required under the relevant healthcare plan.  *Plastic Surgery Group.*, 64 F. Supp. 3d at 461.  Thus, *Plastic Surgery Group* was a "right to payment" case.

Merrick relies heavily on the Third Circuit's decision in *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168, 179 (3d Cir. 2014), which held that an insurer, Cigna, could not compel the providers to arbitrate a payment dispute. In *CardioNet*, the in-network providers brought an action against Cigna on behalf of themselves and their patients regarding Cigna's decision to terminate coverage of outpatient cardiac telemetry ("OCT") devices. *Id.* at 169-70.[9] Utilizing the "right to payment"/"amount of payment" distinction, the court categorized the providers' derivative claims as claims seeking *coverage* under a benefit plan, not *reimbursement* for coverage provided, and explained that "a provider may bring a contract action for an insurer's failure to reimburse the provider pursuant to the terms of the [provider] agreement, while a claim seeking coverage of a service may only be brought under ERISA." *Id.* at 177-78 (citing *Pascak Valley*, 338 F.3d at 403-04). The court found that the allegations underlying the providers' derivative claims—that Cigna had a duty to cover OCT—did not concern the interpretation or performance of the provider agreement and declined to compel arbitration. *Id.* at 177-78.

As alleged, Merrick's basic right to payment has already been established. *See* Am. Compl. ¶¶ 124-131. And by their terms, identified by Merrick, United's letters expressly relate to the amount of payment made. *See id.* ¶¶ 129, 132, 133.[10] However, Merrick claims that his right to payment is still at issue because United's post-payment audit resulted in United recouping the *entire amount* it previously paid Merrick for his services. *See* Pl.'s Opp'n Mem. at

---

[9] The providers' direct claims alleged that Cigna's distribution of a physician update announcing it would no longer cover OCT devises because it is considered OCT to be "experimental, investigational, and unproven," tortiously interfered with the providers' business relationships, violated the Lanham Act, and constituted trade libel. *Id.* at 169-70. The Third Circuit held that, unlike here, the providers' direct claims did not fall within the scope of the arbitration provision because "whether CIGNA performed its obligations under the Agreement [containing the arbitration provisions] has no bearing on whether it harmed the Providers by providing physicians with misleading information on OCT." *Id.* at 175.

[10] Neither party attaches the letters sent from United to Merrick identified in the Amended Complaint.

14

15; *see also id.* at 12 (citing Am. Compl. ¶ 46).  In other words, Merrick argues that because United recouped the entire amount previously paid, it necessarily made a determination that the services provided by Merrick were not covered under the Plan.  *See* Pl.'s Opp'n Mem. at 15 ("United's correspondence and recoupment actions did not raise an 'overpayment' question, but rather the right to recover the full amount of payments Defendants previously made."); *id.* at 15-16 ("The allegation in the overpayment letters that the claims are 'unsupported' was an effort by Defendants to obtain and review documents to determine the payability of the claims previously approved."); *see also* Am. Compl. ¶ 167 ("None of the amounts recouped by Defendants were 'overpayments.'  Defendants are keenly aware of what constitutes an 'overpayment,' and are further keenly aware that the term was not meant to apply to recoveries for total amounts previously paid for claims.").[11]  While it may be inferred that United requested substantiating documents in order to determine whether the amount paid related to services actually covered under the healthcare plan (*i.e.*, a "right to payment" issue) that is not the only permissible inference.  Reading the letters in accordance with their terms as alleged by Plaintiffs, it may be inferred with equal force that United requested the documents to determine whether Merrick over-charged for services that were indisputably covered (*i.e.*, an "amount of payment" issue).

---

[11] Merrick points to Exhibit 26 of the Amended Complaint as evidence that United's actions in the instant dispute implicate Merrick's "right to payment" under the healthcare plan, not an "amount of payment" dispute under the Provider Agreements.  Pl.'s Opp'n Mem. at 12; Am. Compl. ¶ 168.  Exhibit 26, incorrectly identified as Exhibit 25 in Merrick's papers, is a letter sent from United to Merrick stating that United "overpaid [Merrick] for the above claim and a refund is needed."  Merrick contends that Exhibit 26 shows that when United believes it paid an incorrect amount, it does not request medical documentation to determine the overpayment, it "simply communicates it's alleged error to the in-network provider" and requests a refund.  Pl.'s Opp'n Mem. at 12; Am. Compl. ¶ 168.  According to Merrick, the fact that United did not employ a similar method as illustrated by Exhibit 26 here, establishes that Merrick's right to payment, not the *amount* of payment, is at issue in the instant action.  Pl.'s Opp'n Mem. at 12; Am. Compl. ¶ 169.  However, "overpayment" is not defined in the healthcare plan.  Am. Compl. ¶ 166.  It is, therefore, not unreasonable to believe that United may utilize multiple methods to investigate and recoup alleged overpayments, which may arise in different contexts.

15

Moreover, United identifies an independent legal basis for recoupment of alleged overpayments: Merrick's failure to comply with his obligations under the Provider Agreements to provide documentation when requested to do so.  Defs.' R. Mem. at 3.  Plaintiffs' conclusory allegation that United's recoupments were "coverage determinations" is insufficient to implicate the terms of the healthcare plan—this is not a case where Merrick's entitlement to payment depends on the application of ERISA plan terms.  Am. Compl. ¶ 137.  Accordingly, Merrick's claims are best categorized as "amount of payment" claims.

As an alternative argument, Merrick contends that "[w]hen the issue is the full amount of the payment due, as here, even if Defendants are arguing contract-based obligations, such as general requests for documents, these contract provisions are not 'independent' of the health plans, but rather 'inextricably intertwined' with the plan's right to control the terms of payment." Pl.'s Opp'n Mem. at 19 (citing *Montefiore*, 642 F.2d at 332).   However, it is far from clear whether the Provider Agreements are "inextricably intertwined" with the healthcare plan.  While the healthcare plans at issue include a section addressing the refund of overpayments,[12] Merrick does not allege that United recouped payments for the reasons articulated in the healthcare plan.[13]  *C.f. Montefiore*, 642 F.3d at 332 (finding no independent duty because the duty allegedly

---

[12] Merrick represents that the plans attached to the Amended Complaint are "sample plans" and "the fully-insured and self-insured ERISA-governed United Administered Plans at issue in this matter are similar or identical in their salient features to the four samples annexed hereto."  Am. Comp. ¶ 23; Pl.'s Opp'n Mem. at 20 n.9.

[13] The refund of overpayments provision requires that:

> If [United] pay[s] Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to us if any of the follow apply:  [a]ll or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person, [a]ll or some of the  payment we made exceeded the Benefits under the Policy, [or] [a]ll or some of the payment was made in error.

breached, pre-approval, was expressly required by the Plan itself and, therefore, "inextricably intertwined with the interpretation of Plan coverage and benefits.").  Moreover, Merrick explicitly asserts that "these Refund of Overpayment clauses, by their terms, do not apply to the offsetting that is the subject of this case."  Pl.'s Opp'n Mem. at 20 n.9.  Based on the facts as alleged, it is the Provider Agreements, not the healthcare plans, that require interpretation to determine whether United properly recouped payments or violated the Claims Regulation. Accordingly, Merrick's claims arise under the Provider Agreements and may be subject to the agreements' arbitration provisions.

### ii.  Scope of the Arbitration Provisions

The Provider Agreements contain arbitration provisions requiring the arbitration of "any dispute arising out of or relating to this Agreement," Vynorius Decl. Ex. 2 § 23, and "any disputes about their business relationship."  *Id.* Ex. 1 § 8.  Arbitration provisions applying to "any disputes" connected to the parties' agreement are usually interpreted broadly by courts in this Circuit.  *See, e.g.*, *Collins & Aikman Prods. Co.*, 58 F.3d at 20 ("The clause in this case, submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause."); *Chestnut v. Whitehaven Income Fund I, LLC*, No. 12 Civ. 8854 (PAC), 2014 WL 5388562, at *4 (S.D.N.Y. Oct. 23, 2014) ("This broadly worded arbitration clause '[a]ny controversy or claim arising out of or relating to this contract'] creates a presumption in favor of arbitrating Plaintiff[']s claims."); *In re Arbitration Between Gen. Sec. Nat. Ins. Co & AequiCap Program Adm'rs*, 785 F. Supp. 2d 411, 418 (S.D.N.Y. 2011) ("As a threshold matter, arbitration provisions that specify that 'any disputes' shall be determined by arbitration are typically deemed to be 'broad' arbitration provisions."); *see also*

---

Am. Compl. Ex. 1 at 82

*Haining Zhang v. Schlatter*, 557 Fed. App'x 9, 13 (2d Cir. 2014) (summary order) (finding the plaintiff's breach of contract claim was "unambiguously subject to arbitration" where the arbitration agreement covered "[a]ny controversy, dispute or claim regarding the interpretation or performance of this Agreement").

Merrick contends that the business relationship created by the Provider Agreements is not at issue in the instant action.  Pl.'s Opp'n Mem. at 8.  According to Merrick, the business relationship established by the Provider Agreements consist of a *quid pro quo* where Providers are given immediate access to Covered Patients in exchange for the providers' acceptance of a reduced fee-for-service arrangement, credentialing requirements, utilization management, and quality improvement programs.  *Id.* at 8-9.  However, Merrick's alleged obligation to produce substantiating documents for services provided is also part of the *quid pro quo* contained in the Provider Agreements, and therefore the business relationship, established by the Provider Agreements.

Based on the broad language of the arbitration provisions and the presumption of arbitrability that applies where, as here, the scope of the arbitration provisions are at issue, the dispute between Merrick and United arises out of and is related to the Provider Agreements and is about their business relationship.  *See Collins & Aikman Prods. Co.*, 58 F.3d at 19; *Champion Auto Sales, LLC*, 943 F. Supp. 2d at 351.

### iii.  The Applicability of the Arbitration Provisions to Non-Signatories

Merrick contends that because his claims are brought on behalf of his patients, who are not parties to the Provider Agreements and did not agree to arbitration, the claims are not subject to arbitration.  Pl.'s Opp'n Mem. at 20-21 (citing *Denny v. BDO Seidman, LLP*, 412 F.3d 58, 71 (2d Cir. 2005); *Thompson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.

1995)).  Merrick alternatively asserts that he has standing to sue United on behalf of his patients

as a participant designated beneficiary (asserting rights transferred by his patients), as an

assignee of his patients (same), and as a plan designated beneficiary (asserting "rights transferred

by the patient's healthcare plans, with payments being made by the administrator on behalf of the

patient").  *Id.* at 18, 20; Am. Compl. ¶¶ 54, 55.  However, as United aptly points out, Merrick is

asserting his own right to payment, not his patients' rights under their healthcare plans.  *See*

Defs.' Mem. at 10; Defs.' R. Mem. at 3.  Notwithstanding whether Merrick obtained valid

assignments from his patients, Merrick's patients' rights are not at issue in the instant action.

As explained *supra* in Section IV.a.i, Merrick's claims do not implicate coverage

determinations under the healthcare plans.  Moreover, Merrick is prohibited from billing his

patients for payments denied due to Merrick's failure to comply with the Provider Agreements:

> Provider shall not bill Members for charges not paid due to
> . . . Provider's failure to comply with policies or procedures
> of ACN, Plan or Payor.  If Payor denies payment for
> services rendered by Provider on grounds that Provider did
> not follow (a) clinical submission requirements, (b) timely
> claim filing guidelines, or (c) other administrative
> requirements, Provider shall not collect payment from the
> Member for the services.

Vynorius Decl. Ex. 1 § 4.2; Ex. 2 § 6.3 (same).  The Operations Manuals similarly explain that

"[p]atients cannot be billed for services denied due to the failure of the provider or the provider's

staff to follow administrative procedures and requirements of Optum or the Payer" and that

"[t]he patient may not be billed. . . [w]hen information required of the provider related to the

Covered Services has not been supplied to Optum via the Clinical Submission process within the

required time frame [or] [w]hen the service has been denied payment for failure to follow the

administrative procedures of Optum, Plan, or Payer."  Ex. 3 at 17, 19; *see also* Ex. 4 at 16, 18.

While Merrick contends that the refund of overpayments provision of the healthcare plan "indicate[s] that if United were to recover from the medical provider funds previously paid, the patients . . . would remain liable . . . for repayment of the services," this contention fails for two reasons.  Pl.'s Opp'n Mem. at 20 n.9 (citing Am. Compl. Ex 1 at 82).  *First*, Merrick himself asserts that the refund of overpayment provision is not implicated here.  *See id.* at 20 n.9. *Second*, the fact that United may require patients to refund overpayments in certain situations not at issue here, does not impact Merrick's independent agreement with United *not* to bill his patients for payments denied due to Merrick's failure to comply with the Provider Agreements. While Merrick contends that he "seeks payments due to the patient under the ERISA-governed plans," Pl.'s Opp'n Mem. at 20, as alleged, no payments are due to the patients and the patients are not liable to Merrick for payment.  The patients already received services and Merrick was previously paid for those services.  It was Merrick's *own* alleged failure to comply with his contractual obligations, after the initial payment was made, that allegedly resulted in United seeking recoupment.

In *Montefiore*, the Second Circuit held that "beneficiaries may assign their rights under ERISA § 502(a)(1)(B) to healthcare providers that have contracted to bill a benefit plan directly" where the parties' contract expressly permits the provider to obtain payment directly from their patients if payment is not received from the plan or "where a provider's contract with . . . a[n] ERISA benefit plan is silent regarding the question of whether the provider can hold the patient liable for unmet obligations."  *Montefiore*, 642 F.3d at 330 n.10.  The court explained that in these situations "allowing provider-assignees to sue ERISA plans" better serves the interests of the ERISA plan participants and beneficiaries.  *Id.* at 330; *see also Rojas v. Cigna Health and Life Ins. Co.*, No. 14-3455, 2015 WL 4256306, at *5 (2d Cir. July 15, 2015) ("patients may

20

assigned to their doctors the right to collect payment on their behalf in exchange for medical

services."). The Second Circuit explicitly left open "the question of whether a beneficiary can

make a valid assignment to his in-network health care provider in the hypothetical situation in

which the provider has expressly contracted *not* to seek full payment from the beneficiary."

*Montefiore* at 330 n.9 (emphasis original). Whether a situation exists where "the interests of the

ERISA plan participants and beneficiaries are better served by allowing provider-assignees to

sue ERISA plans," this is not that situation because here, the patients' rights are not at issue.[14]

     The Third Circuit's decision in *CardioNet* is not to the contrary. There, the court denied

Cigna's motion to compel arbitration of the providers' derivative claims. *CardioNet*, 751 F.3d at

179. The court explained that "even if these claims would fall within the arbitration clause if

brought directly, it does not follow that these claims when brought derivatively on behalf of

others would necessarily fall within the arbitration clause . . . at least where, as here, the

Agreement does not explicitly require the arbitration of assigned claims." *Id.* at 178 ("assuming

the validity of the Participants' assignments to the Providers, [the Providers] now stand in the

shoes of the Participants, and have 'standing *to assert whatever rights the assignor[s]*

*possessed.*") (citing *Misic v. Bldg. Serv. Employees Health and Welfare Trust*, 789 F.2d 1374,

---

[14] The Second Circuit also recently foreclosed Merrick's argument that he has standing to sue United as a plan designated beneficiary. In *Rojas*, 2015 WL 4256306, at *5, the Second Circuit held that "Healthcare providers are not 'beneficiaries' of an ERISA welfare plan by virtue of their in-network status or their entitlement to payment." The Second Circuit found that "'beneficiary' as it is used in ERISA, does not without more encompass healthcare providers." *Id.* at *3. The court was "persuaded that Congress did not intend to include doctors in the category of 'beneficiaries,'" explaining that "'[b]eneficiary,' clearly refers to those individuals who share in the benefits of coverage—medical services and supplies covered under their health care policy" and that a provider's "right to payment" under the plan "does not a beneficiary make." *Id.*

1378 n.4 (9th Cir. 1986) (per curiam)).  Here, as discussed, Merrick asserts his own rights, not

the rights possessed by the patients.[15]

### iv.  Dismissing Merrick's Claims

United asks this Court to dismiss, not stay Merrick's claims.  Defs.' Mem. at 10.  Merrick

does not address this request.  The Second Circuit recently "join[ed] those Circuits that consider

a stay of proceedings necessary after all claims have been referred to arbitration and a stay

requested."  *Katz v. Cellco Partnership*, No. 14-138, 2015 WL 4528658, at *3 (2d Cir. July 28,

2015).  The Second Circuit recognized the "impetus for a rule permitting dismissal," namely

allowing courts to efficiently manage their dockets, but "conclude[d] that the text, structure, and

underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action

have been referred to arbitration and a stay requested."  *Id.* at *4.[16]  The Second Circuit

---

[15] For the same reason, *Association of New Jersey Chiropractors v. Aetna, Inc.*, No. 09 Civ. 3761 (MAS) (TJB), 2014 WL 7409919 (D.N.J. Dec. 31, 2014), is also inapposite.  In that case, the district court reconsidered its previous decision granting an insurer's motion to compel arbitration in light of the Third Circuit's decision in *CardioNet* holding that under *CardioNet*, the provider could not be forced to arbitrate claims brought "in his capacity as an assignee of his patient's ERISA rights" where the arbitration agreement does not "explicitly require arbitration of assigned claims."  *Id.* at *6 (citing *CardioNet*, 751 F.3d at 178).  However, two important differences distinguish *Association of New Jersey Chiropractors* from the instant action.  *First*, in *Association of New Jersey Chiropractors*, the plaintiffs clearly allege that Aetna sought recoupment of overpayments in part based on a coverage determination under the plan.  *See Assn. of New Jersey Chiropractors v. Aetna, Inc.*, No. 09 Civ. 3761 (JAP), 2011 WL 2489954, at *8 (D.N.J. June 20, 2011) ("[the providers] further argue that they may pursue claims under ERISA because Aetna is challenging their right to payment under the Plans and disputes over whether services are 'experimental and investigational' fall under ERISA.") *vacated on reconsideration by Assn. of New Jersey Chiropractors*, 2014 WL 7409919.  *Second*, the provider is not alleged to have been prohibited from billing his patients for the alleged overpayments.  *Id.*  Accordingly, the Third Circuit's decision in *CardioNet* and the District of New Jersey's decision in *Association of New Jersey Chiropractors* does not persuade this Court that compelling arbitration is improper.

[16] Section 3 of the FAA provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

explained that a mandatory stay is consistent with the FAA's statutory scheme, which authorizes

the immediate interlocutory review of orders refusing to compel arbitration or denying a stay but

denies an immediate appeal from an order compelling arbitration or staying proceedings.  *Id.* at

*3.  A mandatory stay also is "pro-arbitration policy" and "consistent with the FAA's underlying

policy to move the parties to an arbitrable dispute out of court and into arbitration as quickly and

easily as possible."  *Id.* at *3, *4.  "The dismissal of an arbitrable matter that properly should

have been stayed effectively converts an otherwise-unappealable interlocutory stay order into an

appealable final dismissal order.  Affording judges such discretion would empower them to

confer appellate rights expressly proscribed by Congress."  *Id.* at *3.

        Here, no party has requested a stay and while all claims brought by Merrick are subject to

arbitration, claims brought by the other three out-of-network providers, are not.  However,

neither of these facts require dismissal.  *See 75-07 Food Corp. v Trustees of United Food and

Commercial Workers Local 342 Health Care Fund*, No. 13 Civ. 5861 (JFB) (ARL), 2014 WL

691653, at *13 (E.D.N.Y. Feb. 24, 2014) (ordering a stay of proceedings despite the defendant's

request for dismissal because the court found "that the more appropriate action is to stay the

proceedings and to compel arbitration in order to promote expeditious resolution of this

dispute."); *Spangler*, 45 F. Supp. 3d at 353 (finding claims between the two parties in the instant

action were arbitrable and staying a separate proceeding with respect to the claims between the

those parties but declining to stay the dispute between a party not subject arbitration).  While the

Second Circuit's direction to stay, not dismiss, proceedings where all claims were referred to

arbitration applied only to "the disposition of actions in which all claims have been referred to

arbitration," *Katz*, 2015 WL 4528658, at *3 n.6, the Circuit's logic applies with equal force to

---

Federal Arbitration Act, 9 U.S.C. § 3.

the present situation, where all claims brought by one of the plaintiffs were found to be subject to arbitration.  Accordingly, this Court stays the action with respect to Merrick's claims against United.  Claims brought by the three out-of-network providers were not part of the instant motion to compel and are not stayed.

### b.  Judicial Estoppel

Finally, Merrick contends that United is judicially estopped from contending here that the payment disputes arise under the Provider Agreements in order to invoke the arbitration provisions when United has previously successfully litigated "that payment disputes regarding ERISA-governed health plans arise under ERISA and preempt state law."  Pl.s' Opp'n at 16. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  "This rule, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Id.* (citing *Pegram v. Herdrich,* 530 U.S. 211, 227, n.8 (2000)).

"Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion."  *Id.* at 750 (internal quotation marks and citations omitted).  The Supreme Court has identified "several factors" that impact whether judicial estoppel applies in a certain case:

> First, a party's later position must be 'clearly inconsistent' with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or

the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (internal quotation marks and citations omitted).

Applying the above standards, Merrick has not shown that United is judicially estopped from asserting its position in this case.  The cases cited by Merrick are factually and procedurally distinguishable.   The majority of the actions relied on by Merrick are brought directly by ERISA plan members, not providers.  Moreover, all the cases relied on by Merrick, except one,[17] arise in the context of deciding whether the plaintiff states a claim under Rule 12(b)(6) or the district court has jurisdiction over the action based on ERISA preemption, not whether a plaintiff should be compelled to arbitrate his claims.  *See Ibson*, 776 F.3d at 943, 945 (finding member's state law action asserting that United "should have paid medical benefits under the ERISA-regulated plan" was preempted); *McDonald v. Household Intern., Inc.*, 425 F.3d 424, 425 (7th Cir. 2005) (finding member's state law claims "turn[ed] on the fact that [the plaintiff] did not receive the promised insurance coverage in time" were preempted by ERISA); *Plastic Surgery Grp.*, 64 F. Supp. 3d at 467 (finding the provider's state law claims were preempted as "right to payment" claims because the providers failed to "identify how its claims implicated duties separate from the ERISA plan."); *S.M. v. Oxford Health Plans (NY), Inc.*, No. 12 Civ. 4679 (PGG), 2013 WL 1189467, at *1, *4 (S.D.N.Y. Mar. 22, 2013) (finding ERISA preempted the member's state law

---

[17] In *Ibson v. United Healthcare Services, Inc.*, 776 F.3d 941, 943 (8th Cir. 2014), the question of ERISA preemption was raised pursuant to United's motion to strike the member's jury demand.  United argued, that the member's "state law claims were preempted under the complete preemption clause of ERISA and, as such, a jury trial was unavailable."  *Id.*

claims against United for allegedly denying coverage on the grounds that services were not medically necessary, explaining that was a "classic" right to payment determination); *Weisenthal v. United Health Care Ins. Co. of New York*, No. 07 Civ. 0945 (LAP), 2007 WL 4292039, at *1, *6 (S.D.N.Y. Nov. 29, 2007) (finding the provider's state common law claims, brought on behalf of their patients, were preempted by ERISA where "each claim seeks damages for Defendants' decision not to cover certain podiatric procedures performed by Plaintiffs."). Accordingly, United's position in the instant action is not inconsistent with positions taken in previous litigation and United is not judicially estopped from asserting its current position.

**V.   Conclusion**

For the reasons set forth above, United's Motion to Compel Arbitration of Merrick's claims is GRANTED and the claims brought by Merrick are STAYED as against all Defendants. The out-of-network Plaintiffs' claims against all Defendants remain. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 43.

It is SO ORDERED.


Dated:    August 31, 2015
          New York, New York



                                        Edgardo Ramos, U.S.D.J.

26